MRS. JOSEPH DULAC

*vs.*

PROCTOR & BOWIE COMPANY, Employer,

AND

FEDERAL MUTUAL LIABILITY INSURANCE COMPANY.

Kennebec.    Opinion July 7, 1921.

*Compensation not permissible to widow claiming for death of husband, who produced an epigastric or ventral hernia by heavy lifting, having at the same time and prior thereto an inguinal hernia, who died from an operation for both hernias at the same time.  Respondents responsible for the epigastric hernia, but not for the inguinal hernia.  Decedent might have lived if not operated upon for inguinal hernia.  Evidence does not show that death resulted from operation on epigastric hernia alone, the direct result of the injury, which is imperative to recover, and not be left to uncertainty and conjecture.*

This is a petition by a widow, claiming compensation for the death of her husband, who suffered an epigastric or ventral hernia caused by heavy lifting.  Prior to this injury decedent had suffered from an inguinal hernia, but there was no evidence that the inguinal hernia was in any way aggravated by the accident which produced the epigastric hernia.  Death resulted from an operation for the epigastric hernia, for which the defendants were responsible, and at the same time for the inguinal hernia for which the defendants were not responsible, as it was neither caused by the accident nor operated on with the knowledge

and consent of the defendants. Decedent contributed to the proximate cause of his death by directing the surgeon to operate on the inguinal hernia, the cause without which he might not have died.

The only ground upon which the petitioner can recover is upon the death as a direct result of the injury. Had there been no operation decedent might have lived and received compensation under Section 1, Paragraph IX.

Had he been operated upon for epigastric hernia only, for which the respondents were responsible, he might have lived and received compensation under the same paragraph. The inguinal hernia clearly was not effected by the accident. The operation on it was entirely independent of the ventral operation and done at the express request of the deceased. That decedent would have died from the shock of the ventral hernia, is not supported by evidence, but is left to uncertainty or conjecture.

The evidence fails to show any causal relation between the injury and the death of the plaintiff's decedent, hence she can not recover.

On appeal. Joseph Dulac while in the employ of Proctor & Bowie Company as a foreman in a woodworking mill, at Winslow, Maine, received an injury by producing an epigastric hernia by heavy lifting. Prior to and at the time of this injury he had an inguinal hernia. The injury occurred on December 16, 1919, and on February 25, 1920, he was operated upon for both the epigastric hernia, which was caused by the accident, and the inguinal hernia, which was not caused by the accident.

On February 27, 1920, he died from the effect of the operation. The petitioner, his widow, claims compensation for his death. The Chairman of the Industrial Accident Commission granted compensation at the rate of fifteen dollars per week for a period of three hundred weeks or until such time as said compensation so paid shall amount to $3,500.00, and a decree in conformity therewith was entered, from which decree an appeal was taken. Appeal sustained. Petition dismissed. Compensation denied.

Case stated in the opinion.

*F. W. Clair,* and *Carroll N. Perkins,* for plaintiff.

*J. Frank Scannell,* and *Hinckley & Hinckley,* for defendants.

SITTING: SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, WILSON, DEASY, JJ.

SPEAR, J. The petition in this case of Mrs. Joseph Dulac, widow, is in the usual form and describes the accident from the result of which she claims compensation for the death of her husband as

follows: "He was lifting a heavy machine which caused hernia of the abdominal wall in the epigastric region." No other injury is described nor does the evidence, when all considered, nor any finding of the chairman of the commission, disclose any.

Besides the epigastric hernia, also called the ventral hernia, which the evidence shows was produced as claimed, it also appears that the deceased had previously suffered from an inguinal hernia, that is a hernia in the groin. But neither the evidence when all considered, nor the finding of the chairman, attribute any appreciable aggravation of the inguinal hernia to the accident which produced the epigastric hernia. On the direct examination of Mrs. Dulac the inguinal hernia was not mentioned.

In one part of his opinion, the chairman incidentally says: "For many years, this inguinal hernia had not bothered Mr. Dulac, but during and after the lifting in December and January, it bothered him some." Later, he says: "Mr. Dulac had worked for years, suffering no ill effects from inguinal hernia and so far as the evidence shows, could have continued working, so far as it was concerned."

Mrs. Dulac, in speaking of the inguinal hernia says: "He never wore it (the truss) when he was hurt, because he calculated he was all healed up of that and he sent the truss back. He said it was healed up." She further says: "That it was way down from the ventral hernia." While her testimony was somewhat confused, it is nevertheless true that when she was speaking of the hernia as being bad she referred to the ventral hernia as she finally says:

"Q. When he went to the hospital, both hernias were bothering him?

A. The lower one. He didn't complain. He said he could work with that."

Doctor Gousse who was first called says that he found only the ventral hernia and when asked, what was the condition of the lower hernia he said.

A. "I didn't examine the lower hernia.

Q. Didn't examine that?

A. He consulted me for the hernia in the epigastric region only." It is significant that, soon after the accident, the attention of his attending physician was not called to the lower hernia at all.

Doctor Fish, who was later called into the case and who performed the operation says, with reference to the lower hernia, "that by ques-

tioning Mr. Dulac, he learned that he had been injured about three weeks before and that by further questioning, he brought out the fact that he had had a similar injury twelve or fifteen years previously and that it had disappeared so that he had considered that he was cured. This is all the history there was."

We are therefore, of the opinion from the testimony that the only injury of which the decedent complained or from which he suffered was the one described in his petition as what is called the epigastric or ventral hernia located in the pit of the stomach just below the breast bone.

A further analysis of the testimony shows the following undisputed conclusions.

1. Dulac met with his accident and injury on the 16th of December, 1919, and lived and worked, to a degree, at least up to February 22nd, the Saturday before his operation on Tuesday, February 25th.

2. He was injured at two different times by heavy lifting.

3. As a consequence, he received an epigastric hernia.

4. He was also some afflicted with an inguinal hernia of long standing.

5. The respondents had no knowledge, whatever, of the inguinal hernia before or at the time of the operation.

6. Upon their consent and responsibility, he was to be operated upon for the epigastric hernia.

7. Of his own volition, on an independent contract for a new consideration without notice to the defendants, he employed the surgeon, who was to operate in the employ of the defendants upon the epigastric hernia only, to perform a separate operation on the inguinal hernia under the same anesthetic and in addition to the epigastric operation.

8. That these two operations were entirely separate and distinct from one another, the epigastric being located in the pit of the stomach, just below the breast bone, and the inguinal, in the groin.

9. That there were two independent operations, in the surgery employed, as two distinct incisions were made absolutely necessary by the distance separating the location of the two hernias; and two incisions were made.

10. That no reason was found in connection with the epigastric hernia that "should cause an operation on the inguinal hernia; they were entirely disassociated."

11.  That if Mr. Dulac had not broached the subject to the surgeon, there would have been no inguinal operation.

12.  That the epigastric operation was performed first and occupied a period of thirty minutes; the inguinal followed and took from fifty-five to sixty minutes.

13.  That the operation was performed on the 25th of February, 1920 (the doctor says 24th) and the patient died on the 27th of February from "post-operative surgical shock . . . ." a condition in which the patient's resisting powers had not been able to withstand the severity of the operation.

14.  That the shock of the first operation in the opinion of the surgeon might or might not have proved fatal.

To verify the correctness of the foregoing conclusions, it may be well to quote briefly from the testimony of Doctor Fish.

"Q.  So, that if the operation had ceased with the epigastric hernia, would you have expected Mr. Dulac would have died of post-operative surgical shock?

A.  I would consider his chances of living were better with one operation than two.

Q.  That is, 30 minutes duration?

A.  Yes.

Q.  Now Doctor, I would like to put this question.  What is your opinion as to whether Mr. Dulac suffered a post-operative surgical shock during the operation in reference to the epigastric hernia? Which caused his death?

A.  You want me to answer as to which of the two parts of the operation I think caused his death?

Q.  Yes, sir.

A.  My answer would be in view of the fact that the inguinal hernia prolonged the operation, naturally of course it would have contributed towards his death.

Q.  Does your answer also include the opinion that it did cause his death?

A.  That is what I said.  I said it contributed.

Q.  By 'contributed' you use that in the sense of cause?

A.  Yes."

The Doctor then further testified with reference to the relative effect of the shock from the two operations as follows:

"Q.  There is no reason from what you saw of the epigastric hernia that should cause you to operate on the inguinal hernia?

A.  No.

Q.  Entirely disassociated?

A.  Yes.

Q.  And if Mr. Dulac hadn't broached the subject to you, there would not have been any operation on the inguinal hernia?

A.  No.

Q.  That was the result of your conversation with him on the morning of the operation?

A.  Yes.

Q.  And can you state, Doctor, whether or not surgical shock, post-operative surgical shock, always follows an operation?

A.  No.  Perhaps there is more or less surgical shock in every operation, but not enough so it is obvious.

Q.  At the time you finished with the epigastric hernia, there was no evidence of any surgical shock at that time?

A.  No more than in the average patient.

Q.  Nothing to cause any alarm?

A.  No.

Q.  If Mr. Dulac had been returned to his room after that operation, would you have expected any serious results?

A.  You mean after the epigastric?

Q.  Yes?

A.  No.  No more than in the ordinary case of 30 minutes duration.

Q.  You would expect there would be no disastrous or fatal results?

A.  No."

When his attention was called directly to the question whether the operation on the epigastric hernia caused Mr. Dulac's death, Dr. Fish testified:

"Q.  Are you able to state here, Doctor, with positiveness that if you had stopped after the first operation, as my brother calls it, that Mr. Dulac would have lived?

A.  Why, no, I wouldn't be able to state positively that he would.

Q.  You can't state positively here or as your opinion that the surgical shock, if there was one, which followed the operation for the epigastric hernia resulted in the death of Mr. Dulac?

A.  Not positively.

The question was repeated.

Q. Speaking of the epigastric, you can't state positively nor is it your opinion, if any surgical shock followed the operation, that the epigastric hernia was the cause of Mr. Dulac's death?

A. No."

Upon the foregoing facts are deduced the following results:

1. If there had been no operation at all, it is evident that Mr. Dulac as far as the injury was concerned might have lived and received compensation to be computed under the provisions of Section 1, Paragraph IX.

2. If he had been operated on for the epigastric hernia only, for which the respondents were responsible, he might have lived and received compensation under the same paragraph.

3. By employing and directing the surgeon to operate on the inguinal hernia, he himself contributed to the proximate cause of his death, that is, the cause without which he might not have died.

By the process of elimination then, it is apparent that the only ground upon which the petitioner can recover is upon the death as a direct result of the injury, and the chairman of the commission so found as follows: "That Mr. Dulac died as a direct result of the injury sustained on or about December 16, 1919."

We find no evidence to support the finding. The inguinal hernia clearly was not affected by the accident. The operation on it was entirely independent of the ventral operation and done at the express request of the deceased, and was not necessary at that time. The accident only required the ventral operation, and even if the post surgical shock of the ventral operation together with the post surgical shock of the inguinal operation did contribute to his death, still the accident cannot be said to have contributed to his death, because the inguinal operation was not required by reason of the injury received by the accident, but was the independent act of the deceased and without which it is not certain his death would have occurred.

But if it was certain that he would have survived the ventral operation, then certainly death was not the result of the accident, because he voluntarily ordered an independent operation without which he would have lived; and, if the post-surgical shock of both operations did contribute to the death it was not due to the accident, but entirely to his own voluntary act.

But counsel contend in their brief that: "Should this Court be unable to accept as proven that the respondents were also responsible

for so much of the result as was contributed by reducing the inguinal
hernia, the Finding of the Chairman would not necessarily be changed.
In this event, there would be two independent causes contributing to
the same result.   The respondents being responsible for one and not
responsible for the other."

The fallacy of the above contention in its application to the present
case, is found in the fact that the statutory ground, upon which the
plaintiff may recover, is proof that the decedent died as a direct
result of the injury sustained.   Accordingly, inasmuch as the evidence
fails to show that the injury affected the inguinal hernia, at all, the
plaintiff then leaves it to uncertainty or conjecture whether the
decedent would have died from the shock of the ventral hernia, and
cannot then recover, because she must prove that fact.   In *Westman's
Case*, 118 Maine, 138, it is said:   "It is undoubtedly true, and has
been frequently so held, that the burden of proof rests upon the
claimant to prove the facts necessary to establish a right to compen-
sation under the Compensation Act."   In *Mailman's Case*, 118
Maine, 172, it is said:   "There must be some competent evidence.
It may be 'slender.'   It must be evidence, however, and not specula-
tion, surmise, or conjecture."   Both the above cases cite *Sponatski's
Case*, 220 Mass., 528, in which it is said:   "The dependent must go
further than simply to show a state of facts which is equally consis-
tent with no right to compensation as it is with such right.   They
can no more prevail if factors necessary to support the claim are left
to surmise, conjecture, guess or speculation, than can a plaintiff in
the ordinary action in tort or contract.   A sure foundation must be
laid by a preponderance of evidence in support of the claim before
the dependents can succeed."

However, as before seen, both operations were performed.   The
patient did not survive.   The evidence leaves it in doubt whether
the post-operative shock of the ventral hernia caused the death, but
without any doubt that the operation upon the inguinal hernia con-
tributed thereto.   Under the plaintiff's legal contention, therefore,
that the post-operative shock of both operations contributed to the
death, for one of which the defendant was not responsible, it still
remains in the realm of surmise, guess or conjecture whether the
accident, which did not affect the inguinal hernia, was the direct
cause of the decedent's death.

Counsel for petitioner however contends that the rule applicable to this case was declared by the Appellate Court of Indiana in Puritan Bed Spring Co., 120 N. E., 417, as follows: "Appellant concedes, and correctly so, that where an employee affected with disease receives a personal injury under such circumstances that the act in question would entitle him to compensation had there been no disease involved, and such disease is materially hastened to a final culmination by the injury, there may be an award, if it is shown that such injury was the result of accident; that in such cases the court will not undertake to measure the degree of disability due respectively to the disease, and to the accident, but the consequence of the disease will be attributed solely to the accident."

In this case, previous existing disease was the contributing cause which helped produce death. We entirely agree with the doctrine of this case. This court would not for a moment undertake to differentiate between a direct cause and a contributing cause, where a pathological predisposition to infirmity or disease was aggravated or brought into activity resulting in death by reason of the contributing injury. Although a man may be very weak from predisposition, it is none the less homicide to inflict violence sufficient to kill him, though similar violence might not seriously affect a well and vigorous man.

But the above is not the case before us. It cannot be said that the post-operative shock of the epigastric operation would have produced death; it is not so claimed. In other words, the operation upon the epigastric hernia would not have affected, nor have been affected by the existence of the inguinal hernia at all, as a predisposition to weakness, if the latter had been let alone.

The chairman cites as the legal basis of his finding, *Hoffman* v. *Pierce Arrow Motor Car Co.*, a case decided by the Industrial Accident Commission of New York, but upon appeal the decision was reversed as will appear in 183 N. Y. Supp., Page 766.

We are unable to find that any causal relation between the injury and the death of the plaintiff's decedent is shown.

*Appeal sustained.*
*Petition dismissed.*
*Compensation denied.*